**BRANCH MINISTRIES, INC., et al., Plaintiffs,**

v.

**Charles O. ROSSOTTI, Commissioner, Internal Revenue Service, Defendant.**

**No. CIV. A. 95–0724 (PLF).**

United States District Court, District of Columbia.

March 30, 1999.

16

Colby Mims May, Mark Nathan Troobnick, American Center for Law & Justice, Washington, DC, for plaintiffs.

Donald J. Gavin, U.S. Dept. of Justice, Washington, DC, for defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This case is about the decision of the Internal Revenue Service to revoke the status of plaintiff Branch Ministries as an organization exempt from taxation pursuant to 26 U.S.C. § 501(c)(3). Before any discovery was conducted, the government filed a motion to dismiss or for summary judgment. Plaintiffs sought discovery on their claim that they were victims of selective prosecution, and the Court granted plaintiffs' motion to compel. The case now is before the Court on the renewed motion of the government for summary judgment and on plaintiffs' cross-motion for summary judgment. Upon consideration of the cross-motions, the Court concludes that the government has established that there are no material facts in dispute and that it is entitled to judgment as a matter of law.

## I. FACTUAL BACKGROUND

The genesis of this case occurred two presidential elections ago. Governor William Jefferson Clinton of Arkansas was running as the nominee of the Democratic party for President of the United States. On October 30, 1992, four days before the election, plaintiff Branch Ministries, Inc. ("BMI"), doing business as the Church at Pierce Creek, expressed its concern about the moral character of Governor Clinton in a full page advertisement in the Washington Times and in USA Today. The advertisement proclaimed "Christian Beware. Do not put the economy ahead of the Ten Commandments." It asserted that Governor Clinton supported abortion on demand,

homosexuality and the distribution of condoms to teenagers in public schools. The advertisement cited various Biblical passages and stated that "Bill Clinton is promoting policies that are in rebellion to God's laws." It concluded with the question: "How then can we vote for Bill Clinton?" At the bottom of the advertisement, in fine print, was the following notice: "This advertisement was co-sponsored by The Church at Pierce Creek, Daniel J. Little, Senior Pastor, and by churches and concerned Christians nationwide. Tax-deductible donations for this advertisement gladly accepted. Make donations to: The Church at Pierce Creek," and provided a mailing address. Defs' Motion for Summ. J., Decl. of Peter Lorenzetti, Exh. E.[1]

At the time the advertisement was published, BMI was an organization exempt from taxation pursuant to 26 U.S.C. § 501(c)(3). On October 31, 1992, the New York Times published an article entitled "Religious Right Intensifies Campaign for Bush." Pl's Mot'n for Summ. J., Exh. 1. The article discussed the role of the religious right in the 1992 presidential campaign and mentioned the advertisement described above, but it did not mention Branch Ministries or the Church at Pierce Creek by name. The article also stated, erroneously as it turned out, that "[t]he advertisement is to run in 157 more papers this weekend." Id. On December 1, 1992, the New York Times published an op-ed piece by Anthony Lewis entitled "Tax-Exempt Politics?" Id. Lewis discussed the "use of tax-exempt money for politics," and, as a case in point, he focused on the advertisement run in USA Today by the Church at Pierce Creek. Lewis opined that "[t]he sponsors [of the advertisement] almost certainly violated the Internal Revenue Code." Id.

On November 20, 1992, the Regional Commissioner of the Internal Revenue

---

1. The plaintiffs in this case are Branch Ministries, Inc., doing business as the Church at Pierce Creek, and Pastor Dan Little.

Service sent the Church at Pierce Creek a letter stating that he was authorizing the District Director to begin "a Church Tax Inquiry because a reasonable belief exists that you may not be tax-exempt or that you may be liable for tax. The general subject matter of the inquiry concerns political expenditures which you may have paid or incurred, as well as whether you are tax-exempt." Defs' Motion for Summ. J., Decl. of Peter Lorenzetti, Exh. F. The letter also requested certain information "[i]n order to better understand your activities," including information about the USA Today advertisement, any political campaigns for public office in which the Church had sponsored advertisements, the political expenditures of the Church, the total amount of contributions received in response to the USA Today advertisement and the purpose of the Church. *Id.*

On December 23, 1992, the Church sent a response to the request for information. Defs' Motion for Summ. J., Decl. of Peter Lorenzetti, Exh. G. The Church took the position that it had not engaged in any political activity; the advertisement printed in USA Today and the Washington Times constituted a "warning to members of the Body of Christ," and the warning "did not constitute participation in a political campaign." *Id.* The Church refused to respond to most of the requests made by the IRS, including the request for the identities of persons who had contributed money in response to the USA Today and Washington Times advertisement. *Id.*

By letters of February 11, 1993 and August 11, 1993, the IRS informed the Church that it was beginning a Church Tax Examination, and it again requested certain documents from the Church. Defs' Motion for Summ. J., Decl. of Peter Lorenzetti, Exhs. H, J. At one point, the IRS drafted a summons to require the Church to submit the requested information, but the summons was never issued. Finally, on January 19, 1995, the IRS issued a letter stating that BMI's status as a Section 501(c)(3) tax-exempt organization was revoked, retroactive to January 1, 1992. *Id.,* Exh. K.[2] Three months after the revocation letter was issued, plaintiffs filed this action asserting that the revocation of its status as a Section 501(c)(3) organization violates the Internal Revenue Code, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, the First Amendment and the church's equal protection rights under the Fifth Amendment.

In June 1995, the government filed a motion to dismiss or for summary judgment. In response, plaintiffs filed a motion to compel, arguing that they were entitled to discovery on their selective prosecution claim. While the motion was pending, the Supreme Court decided *United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), in which it clarified that a defendant in a criminal case must make a colorable showing of both discriminatory intent and discriminatory effect in order to obtain discovery on a selective prosecution claim. Subsequently, this Court granted plaintiffs' motion to compel and ordered the government to provide fairly broad discovery. The Court noted that "plaintiffs' evidence is by no means strong at this stage of the litigation," but it concluded that plaintiffs had "produced sufficient evidence to raise a colorable claim of intentional discrimination." *See Branch Ministries v. Richardson,* 970 F.Supp. 11, 17 (D.D.C. 1997). It therefore ordered discovery to the extent permitted by the Internal Revenue Code. *Id.*

The IRS disclosed nearly 4000 pages of documents to plaintiffs, including the entire investigatory file it had maintained on the Church. Plaintiffs subsequently filed another motion to compel and for addition-

---

**2.** During the investigation of the Church, the IRS apparently also contemplated imposing an excise tax on the Church. No excise tax ever was imposed, however, and the government has submitted a declaration indicating that an excise tax will not be assessed. Def's Opp. to Pl's Mot. to Compel, Declaration of Joan Sweeney.

al discovery. Plaintiffs sought (1) to compel the IRS to be more forthcoming in its discovery responses and (2) to take depositions from various religious leaders to establish that political activity occurs in churches. On March 31, 1998, the Court denied plaintiffs' motion. *See* Memorandum Opinion and Order of March 31, 1998.

## II. DISCUSSION

Plaintiffs seek to have the revocation decision of the IRS reversed on a variety of statutory and constitutional grounds. The basic premise of their statutory claims is that once a church applies for and is deemed a Section 501(c)(3) organization, the IRS lacks authority to revoke that status unless it concludes that the church is not a *bona fide* church. Plaintiffs also contend that the IRS selectively prosecuted the Church on the basis of its political and/or religious views in violation of the Equal Protection Clause and that the revocation violated the First Amendment and the Religious Freedom Restoration Act.

### A. Statutory Framework

Churches occupy a unique position in the tax code. A church or religious organization that so chooses may seek an advance ruling from the IRS that it is exempt from taxation pursuant to 26 U.S.C. § 501(c)(3).[3] A church or religious organization seeking tax-exempt status under Section 501(c)(3) is required to provide the IRS with fairly detailed information with respect to its mission, goals, and organizational structure so that the IRS can determine whether the organization in fact is a *bona fide* religious organization eligible for tax-exempt status. *See* 26 C.F.R. § 1.501(a)–1(b)(1)(iii). In addition, the organization is required to make certain representations, including a representation that it will not participate in any political campaign on behalf of, or against, any candidate for political office. *See* Defs' Motion for Summ. J., Decl. of Peter Lorenzetti, Exh. A at 4.

If an organization receives an advance determination from the IRS that it meets the Section 501(c)(3) criteria, there are two effects. First, the organization is exempt from paying taxes under Section 501(a). *See* 26 U.S.C. § 501(a) ("An organization described in subsection (c) ... shall be exempt from taxation under this subtitle"). Second, there is a presumption that one who contributes to the organization can deduct the amount of the contribution from his or her taxable income. *See* 26 U.S.C. § 170(c) (defining deductible charitable contribution). An organization with an advance determination is listed by the IRS as a Section 501(c)(3) organization in Publication 78. A contributor can deduct contributions to the 501(c)(3) organization from his or her taxable income, and if that person's tax return is audited by the IRS, the fact that the organization is listed in Publication 78 establishes a presumption that the contribution is tax-deductible.

The Internal Revenue Code treats churches differently from other tax-exempt organizations. While a church may file for Section 501(c)(3) status, it is not required to do so in order to be tax-exempt. A church may simply hold itself out as a church and claim tax-exempt status pursuant to Section 508(c). *See* 26 U.S.C. § 508(c) ("New organizations must notify Secretary that they are applying for recognition of section 501(c)(3) status," but that requirement "shall not apply to churches, their integrated auxiliaries, and conventions or associations of churches"). A person who contributes to a church claiming tax-exempt status pursuant to Section 508(c) may deduct that contribution from his or her income, but if the contributor is audited, he or she has the

---

**3.** Section 501(c)(3) provides that any organization "operated exclusively for religious, charitable, [or other specified] purposes, ... and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office" shall be exempt from taxation. 26 U.S.C. § 501(c)(3).

burden of establishing that the church in fact meets the qualifications of a Section 501(c)(3) organization. In other words, because the church has not previously been determined by the IRS to have met the Section 501(c)(3) criteria, there is no presumption that the church is tax-exempt under Section 501(c)(3).

The Church Audit Procedures Act ("CAPA"), 26 U.S.C. § 7611, sets forth detailed procedures that the IRS must follow before conducting a "church tax inquiry" to revoke the tax-exempt status of a church. In addition, CAPA provides that the Secretary of the Treasury may determine that an organization "is not a church which (i) is exempt from taxation by reason of section 501(a), or (ii) is described in section 170(c) [as an organization eligible to receive charitable contributions] ... only if the appropriate regional counsel of the Internal Revenue Service determines in writing that there has been substantial compliance with the requirements of [CAPA] and approves in writing of such revocation ...." 26 U.S.C. § 7611(d)(1)(A).

### B. Statutory Violation

█ Plaintiffs argue that the IRS has no statutory authority to revoke the Section 501(c)(3) status of a church unless it determines that the church is not a *bona fide* church. It is undisputed by the parties that the Church at Pierce Creek is a *bona fide* church, and the IRS does not argue, nor has it ever argued, that it revoked the Section 501(c)(3) status of the church because it doubted that the Church at Pierce Creek is a *bona fide* church. Instead, the IRS asserts that it revoked the Section 501(c)(3) advance determination because the church undertook partisan political activity in direct violation of Section 501(c)(3).

Plaintiffs contend that the Church Audit Procedures Act ("CAPA"), 26 U.S.C. § 7611, provides a zone of protection that prevents the IRS from revoking the Section 501(c)(3) status of a church on the basis of partisan political activity. Citing selected phrases of subsections (a) and (d) of CAPA, plaintiffs argue that CAPA authorizes the Secretary of the Treasury to initiate a church tax inquiry and to revoke the tax-exempt status of a church only where there is cause to believe that the church is *not* in fact a *bona fide* church. *See* 26 U.S.C. § 7611(a)(2)(A) (the Secretary may begin a church tax inquiry only if an appropriate high-level Treasury official reasonably believes "that the church may not be exempt, by reason of its status as a church, from tax ..."); 26 U.S.C. § 7611(d)(1)(A) (the Secretary may revoke tax-exempt status if he "determine[s] that an organization is not a church ..."). In their view, Section 7611 provides nothing more than a mechanism to revoke the tax-exempt status of "sham churches." *See* Transcript of Hearing of October 29, 1998 at 8, 14–17. If the church is *bona fide*, the IRS can only impose a tax or seek an injunction to stop the activities of the Church; it cannot revoke. *Id.*

The clear statutory language of CAPA, however, provides that the Secretary is authorized to revoke the tax-exempt status upon a determination that the organization "is not a church which (i) is exempt from taxation by reason of section 501(a) ...." 26 U.S.C. § 7611(d)(1)(A). Section 501(a) in turn provides that an "organization described in subsection [501](c) ... shall be exempt from taxation under this subtitle ...." Subsection (c)(3) describes "[c]orporations ... organized and operated exclusively for religious ... purposes ... which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3).[4]

---

4. IRS regulations also provide that "[a]n organization is an *action* organization if it participates, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office," 26 CFR § 1.501(c)(3)–1(c)(3)(iii), and that an "organization is not operated exclusively for one or more exempt purposes [within the meaning of

In this case, the Secretary determined, in compliance with the procedures set forth in CAPA, that the Church at Pierce Creek, while it remained a *bona fide* church, was not an organization described in Section 501(c)(3) because it had published or distributed a statement in opposition to a candidate for public office. Because the Secretary determined that the Church at Pierce Creek was not an organization described in Section 501(c)(3), he had the statutory authority to determine that it was no longer a church that was exempt from taxation under Section 501(a) and to revoke its Section 501(c)(3) tax-exempt status. *See* 26 U.S.C. § 7611(d)(1)(A).

### C. Constitutional Claims

#### 1. Selective Prosecution Claim

Plaintiffs contend that the decision of the IRS to revoke the Section 501(c)(3) status of the Church was unconstitutionally motivated by the political and religious beliefs of the Church. Plaintiffs carry a heavy burden on their selective prosecution claim because there is a strong presumption that the IRS is properly discharging its official duties when it makes prosecutorial decisions. *See United States v. Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480. Plaintiffs have failed to meet that burden.

 In order to prevail on a selective prosecution claim, plaintiffs must clearly establish (1) that the prosecutorial decision had a discriminatory effect, and (2) that it was motivated by a discriminatory purpose or intent. *See United States v. Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480. A showing of discriminatory effect requires plaintiffs to demonstrate that similarly situated persons of other religions or political beliefs have not been prosecuted. Discriminatory purpose may be established either with direct evidence of intent or with "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson,* 970

F.Supp. at 17; *see King v. Palmer,* 778 F.2d 878, 881 (D.C.Cir.1985). For obvious reasons, the selective prosecution standard is a "demanding one," and plaintiffs must present "clear evidence" of both discriminatory effect and intent in order to establish their claim. *See United States v. Armstrong,* 517 U.S. at 463, 465, 116 S.Ct. 1480. Even after extensive discovery, plaintiffs have not presented "clear evidence" of either element, and the government therefore is entitled to summary judgment on this claim.

 Plaintiffs have presented little or no evidence of discriminatory effect. As the government has pointed out, plaintiffs have not identified any "similarly situated" organization that retained its Section 501(c)(3) status. Plaintiffs' evidence of similarly situated entities relates only to churches that have allowed political leaders to appear at religious services or churches that have used the pulpit to advocate a certain message. For purposes of deciding whether to begin an investigation, however, those entities are not similarly situated to the Church. The IRS decided to revoke the tax-exempt advance determination from the Church because the Church had run a print advertisement in two national newspapers that was fully attributable to the Church and that solicited donations. Plaintiffs have pointed to no other instance in which a church so brazenly claimed responsibility for a political advertisement in a national newspaper and solicited tax-deductible donations for that political advertisement. In fact, plaintiffs have provided no evidence of an instance in which a political act could so easily be attributed to a tax-exempt church.

Virtually all of the 65 examples cited by plaintiffs are of candidates or other political figures speaking from the pulpits of churches or at synagogues—Reverend Jesse Jackson, Senators Al Gore, Charles Robb, Frank Lautenberg and Tom Harkin,

---

Section 501(c)(3) ] if it is an *action* organiza-
tion." *Id.* § 1.501(c)(3)–1(c)(3)(i).

Senate candidates Oliver North and Harvey Gantt, Governors Bill Clinton, Mario Cuomo and Douglas Wilder, gubernatorial candidates James Gilmore, III and Don Beyers, Jr., Mayors Marion Barry, Kurt Schmoke and Rudolph Giuliani, and numerous others. *See* Plaintiff's Motion for Summ. J., Exh. 12. Plaintiffs maintain that this conduct is similar to that of the Church because, like the advertisement at issue here, those instances involve "public declarations" urging people to vote for or against particular candidates. Transcript of Hearing of October 29, 1998, at 24. As the Court previously noted, however, "candidates giving speeches from pulpits or churches or churches sponsoring political debates or forums ... are substantially dissimilar to the instant case." *See Branch Ministries v. Richardson,* 970 F.Supp. at 16.

In the only two proffered instances with arguably similar circumstances, the IRS in fact did act to revoke the tax-exempt status of the two religious organizations involved. In 1964, the IRS revoked the tax-exempt status of Christian Echoes National Ministry, Inc., a religious corporation, in part because "it had directly and indirectly intervened in political campaigns on behalf of candidates for public office." *See Christian Echoes National Ministry, Inc. v. United States,* 470 F.2d 849, 853 (10th Cir.), *cert. denied,* 414 U.S. 864, 94 S.Ct. 41, 38 L.Ed.2d 84 (1973). The other case involved The Way International. After a three-year audit from June 1, 1975 through August 31, 1978, the IRS in 1985 revoked the Section 501(c)(3) tax-exempt status of The Way International retroactively, in part because The Way had engaged in political activity. *See* Pl's Motion to Compel, Exh. 3 at ¶ 4; Def's Opp. to Motion to Compel at 5. The Way International filed suit in United States District Court challenging that revocation and simultaneously applied to the IRS for a Section 501(c)(3) determination for the period after September 1, 1983. When the Secretary of the Treasury failed to act on that application, The Way filed suit in the United States Tax Court. *See* Pl's Motion to Compel, Exh. 3. In 1987, the parties reached a global settlement; The Way was granted a Section 501(c)(3) tax exemption effective September 1, 1983, but the revocation for the prior years was allowed to stand. *See* Def's Opp. to Motion to Compel at 5.

Plaintiffs argue that the fact that the IRS took actions against Christian Echoes and The Way does not undermine their selective prosecution claim because neither was a church. They maintain that the IRS has "never revoked the tax exempt status of a church qua church before," Transcript of Hearing of October 29, 1998 at 22, and that the IRS has impermissibly singled out the Church at Pierce Creek. They argue that Christian Echoes was a "religious radio program" rather than a church, and that the IRS revoked the "group exemption" of The Way rather than its status as a church. *See* Pl's Memorandum in Support of Motion for Summ. J. at 4. As described by the court of appeals, Christian Echoes was a religious organization, not a church; it was "a nonprofit corporation" founded to establish and maintain religious radio and television broadcasts, religious magazines and other publications and religious educational institutions. *See Christian Echoes National Ministry, Inc. v. United States,* 470 F.2d at 851–52. The record regarding The Way is concededly unclear from the materials provided by the parties, but what is clear is that the IRS "revoked [The Way's] tax-exempt status under § 501(c)(3)." *See* Pl's Motion to Compel, Exh. 3 at ¶ 4. While the parties agree that the tax-exempt status eventually was restored, the Church in this case, unlike The Way International, has never sought a new Section 501(c)(3) advance determination from the IRS.

Even assuming that plaintiffs are correct that there are factual differences between their case and the cases of The Way International and Christian Echoes, those differences only provide further support

for the government's argument that the action taken by the Church at Pierce Creek was unique; plaintiffs simply have provided no evidence that there are similarly situated churches that have engaged in similar conduct. In the circumstances presented here—where a tax-exempt church bought an advertisement that stated its opposition to a particular candidate for public office, attributed the advertisement to the Church and solicited tax-deductible contributions for the advertisement—the IRS was justified in revoking the tax-exempt status of the Church, even if it might refrain from revoking the status of churches where attribution is less clear. In the absence of any showing that any other churches engaged in similar conduct and did not have their tax-exempt status revoked, plaintiffs have failed to establish discriminatory effect. *See United States v. Al Jibori*, 90 F.3d 22, 26 n. 1 (2d Cir. 1996) (statistical fact of "paucity" of prosecutions under particular statute not sufficient to establish selective prosecution claim where there is reasonable explanation for the absence of prosecutions); *Attorney General v. Irish People, Inc.*, 684 F.2d 928, 946 (D.C.Cir.1982) ("If there are few 'similarly situated' to [defendant], it is precisely because of its uniqueness that we would find it difficult to fault the Attorney General's decision to require it to register"), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

Plaintiffs also have failed to provide clear evidence of discriminatory motivation by the IRS. Plaintiffs' evidence of discriminatory intent focuses primarily on (1) the statistical fact that the IRS had not previously revoked the Section 501(c)(3) status of a church for its involvement in a campaign for political office, and (2) the handwritten notes of one of the investigators from the outset of the investigation. While statistical evidence may be used to establish discriminatory intent, it is not sufficient for plaintiffs to assert that the lack of any other revocations must mean that the IRS had a discriminatory intent where, as here, plaintiffs have failed to provide any evidence that there are any similarly situated churches that retained their Section 501(c)(3) status. *See Branch Ministries v. Richardson*, 970 F.Supp. at 17.

The final piece of evidence proffered by plaintiffs to support their claim of discriminatory intent is a document with handwritten notations on it that was provided to plaintiffs during the course of discovery. *See* Pl's Mot'n for Summ. J., Exh. 2. The document has a reference to USA Today and the Church at Pierce Creek, along with a notation about "150 other papers." There is a reference to "Christians Beware" and "anti-Clinton," and the phrase "NY Times" followed by an arrow and then the words "Militant Right Org tied into it." The document also includes notations about "7611," an "excise tax" and "forfeit of exemption" followed by two question marks. Plaintiffs assert (1) that the document was written by someone involved in the IRS investigation and (2) that it establishes that the investigation was motivated by an intent to discriminate against the church based on its religious and political beliefs. The government acknowledges that the document was written by a government official. *See infra*, note 5.

Even taking the broadest reading of the statements in the document, the document is not clear evidence of discriminatory intent. At most, it indicates only that someone connected to the investigation had read the New York Times article, thought that the advertisement placed by the Church was advocating against Governor Clinton and may have violated the tax-exempt provisions of Section 501(c)(3), and contemplated various sanctions including an excise tax or revocation of tax-exempt status. Nothing in that document suggests, let only provides clear evidence of, discriminatory intent. Plaintiffs therefore have not established by clear evidence that the decision to revoke the tax-exempt sta-

tus of the Church was motivated by a discriminatory purpose.[5]

When the Court granted plaintiffs' motion to compel discovery on their selective prosecution claim, it noted that "[b]ecause plaintiffs' evidence consists mostly of the absence of other similar actions by the IRS, it may well turn out to be insufficient to withstand a decision on the merits of the selective prosecution claim." *Branch Ministries v. Richardson,* 970 F.Supp. at 17. In view of the fact that the extensive discovery provided by the IRS has turned up little, if any, evidence to support plaintiffs' claim of selective prosecution, plaintiffs simply have failed to meet their burden. The selective prosecution claim therefore fails.

### 2. Free Exercise Claim

■ Plaintiffs next contend that the revocation of their tax-exempt status violated the right to free exercise of religion guaranteed by the Religious Freedom Restora-

tion Act, 42 U.S.C. § 2000bb, ("RFRA") and the First Amendment.[6] RFRA provides that the Government "shall not substantially burden a person's exercise of religion … [unless] it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1. Plaintiffs have the initial burden of establishing that the government has substantially interfered with their exercise of religion. *See Weir v. Nix,* 114 F.3d 817, 820 (8th Cir.1997). If, and only if, plaintiffs can demonstrate a substantial burden, then the government has the burden under RFRA of establishing that the revocation serves a compelling governmental interest and that revocation is the least restrictive means of accomplishing that compelling interest. *See id.; Diaz v. Collins,* 114 F.3d 69, 72 (5th Cir. 1997).[7]

5. The government has submitted the declaration of Mr. Laurence Ziegler, an Assistant District Counsel with the Brooklyn District Counsel Office, who was "involved in providing legal advice to the Brooklyn District Office of the Internal Revenue Service" with respect to the Branch Ministries investigation. *See* Def's Supp. in Support of Motion for Summ. J. (Declaration of Laurence Ziegler) at ¶ 1. Mr. Ziegler asserts that he wrote the document in question and that it reflects his notes of a telephone conversation with IRS Branch Chief Peter Lorenzetti. *Id.* at ¶¶ 2–4. He also asserts that he knows of no political influence motivating the investigation of Branch Ministries and that he harbors no ill will toward plaintiffs. *Id.* at ¶¶ 9, 10.

6. Since the filing of the complaint, the Supreme Court has declared RFRA unconstitutional as applied to state and local governments. *See City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The federal government does not, however, challenge the constitutionality of RFRA as applied to it. *See Alamo v. Clay,* 137 F.3d 1366 (D.C.Cir.1998) (assuming without deciding that RFRA is constitutional as applied to federal government); *In re Young,* 141 F.3d 854, 863 (8th Cir.) (holding RFRA constitutional as applied to federal law), *cert. denied,* —— U.S. ——, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998).

7. The Supreme Court has held that under the Free Exercise Clause of the First Amendment, application of a neutral, generally applicable law need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Employment Div. v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Under the rationale of *Smith,* plaintiffs cannot state a First Amendment Free Exercise Clause claim.

Even if the holding of *Smith* does not apply to this case, *see EEOC v. Catholic University of America,* 83 F.3d 455, 467 (D.C.Cir.1996) (under certain circumstances, *Smith* does not preclude First Amendment Free Exercise Clause challenge to neutral law), a plaintiff seeking to raise a claim under the Free Exercise Clause of the First Amendment has the same burden as a plaintiff raising a claim under RFRA. *See* 42 U.S.C. § 2000bb(b) (purpose of RFRA is "to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened"). Because the Court concludes that

As an initial matter, plaintiffs have failed to establish that the revocation of the Church's Section 501(c)(3) tax-exempt status substantially burdened its right to freely exercise its religion. A substantial burden exists where the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), or where the government forces an individual to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion." *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *See Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir.1996). Plaintiffs have provided no evidence that the revocation of Section 501(c)(3) status by the IRS was in any way connected to plaintiffs' refusal to violate their religious beliefs or abandon a precept of their religion. Instead, the revocation was undertaken because of plaintiffs' involvement in partisan political activity.

Plaintiffs contend that the decision of the IRS to revoke Section 501(c)(3) status has imposed a number of burdens: the Church now is treated as a corporation for purposes of determining state tax liability; there is the specter of a federal tax assessment looming over the Church; and there are practical differences between holding oneself out as a Church under Section 508 and having a Section 501(c)(3) advance determination. For instance, people are less likely to contribute money to a church if they know they will have the burden of establishing that the Church in fact is tax-exempt. While plaintiffs probably are correct that the revocation has imposed a burden on their ability to engage in partisan political activity and may deter some people from contributing money to the Church, they have failed to establish that the revocation has imposed a burden *on*

plaintiffs have failed to establish a substantial burden for purposes of RFRA analysis, it follows that they also have failed to establish a

*their free exercise of religion.* Plaintiffs were offered a choice: they could engage in partisan political activity and forfeit their Section 501(c)(3) status or they could refrain from partisan political activity and retain their Section 501(c)(3) status. That choice is unconnected to plaintiffs' ability to freely exercise their religion. Plaintiffs therefore have not demonstrated that the IRS substantially burdened their free exercise of religion.

In fact, the only way in which the revocation of Section 501(c)(3) status has had any effect on plaintiffs' exercise of religion is that the Church may now have less operating money to spend on religious activities because it is a taxable entity. The fact that plaintiffs may now have less money to spend on their religious activities as a result of their participation in partisan political activity, however, is insufficient to establish a substantial burden on their free exercise of religion. *See Jimmy Swaggart Ministries v. Board of Equalization of California*, 493 U.S. 378, 391, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) ("to the extent that imposition of a generally applicable tax merely decreases the amount of money appellant has to spend on its religious activities, any such burden is not constitutionally significant"). *Cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 603–04, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) ("Denial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets").

Even if plaintiffs could establish a substantial burden, the government has met the compelling interest standard. The government has a compelling interest in maintaining the integrity of the tax system and in not subsidizing partisan political activity, and Section 501(c)(3) is the least restrictive means of accomplishing that

First Amendment Free Exercise Clause violation.

purpose. *See Hernandez v. Commissioner*, 490 U.S. 680, 699–700, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("even a substantial burden would be justified by the 'broad public interest in maintaining a sound tax system,' free of 'myriad exceptions flowing from a wide variety of religious beliefs' "); *Adams v. Commissioner*, 170 F.3d 173 (3rd Cir.1999) ("The least restrictive means of furthering a compelling interest in the collection of taxes ... is in fact, to implement that system in a uniform, mandatory way"); *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d at 856–57 ("[T]he limitations imposed by Congress in Section 501(c)(3) are constitutionally valid. The free exercise clause of the First Amendment is restrained only to the extent of denying tax-exempt status and then only in keeping with an overwhelming and compelling Governmental interest: That of guarantying that the wall separating church and state remain high and firm"). Plaintiffs therefore cannot prevail on their free exercise claims.

### 3. Political Expression Claims

■ Plaintiffs argue that the IRS engaged in content-based viewpoint discrimination in violation of their Fifth Amendment right to equal protection and in violation of their First Amendment right to free speech. The Fifth Amendment equal protection claim mirrors plaintiffs' Fifth Amendment selective prosecution claim. Plaintiffs contend that the IRS targeted the Church for revocation because the Church had expressed its political views. Because plaintiffs have failed to provide any evidence of similarly situated churches that have not had their Section 501(c)(3) status revoked, *see supra* at 21 – 22, plaintiffs' Fifth Amendment claim fails.

■ "Congress is not required by the First Amendment to subsidize lobbying." *Regan v. Taxpayers With Representation*, 461 U.S. 540, 546, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). Plaintiffs contend, however, that churches are different. Plaintiffs maintain (1) that churches are

open fora, (2) that the IRS decision to revoke the Section 501(c)(3) status of the Church constitutes viewpoint discrimination, and (3) that the IRS therefore must demonstrate a compelling interest in order to justify the revocation. *See Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). There are a number of problems with plaintiffs' argument. First, it is not at all clear that private churches in fact can be deemed open public fora. *See id.* (citing, as examples of open fora, numerous public or government spaces).

Second, even if a church is an open forum, that would be irrelevant to the revocation at issue in this case. The Section 501(c)(3) status of the Church was not revoked on the basis of any expressive activity that occurred on the property of the Church, the purportedly "open" forum. Instead, the Section 501(c)(3) status was revoked because the Church took out a full-page advertisement advocating against a partisan political candidate. In this case, the relevant forum is the channel of communication, the newspaper advertisement itself, rather than the property of the Church, the messenger. *See Cornelius v. NAACP Legal Defense and Ed. Fund*, 473 U.S. 788, 800–02, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("in defining the forum we have focused on the access sought by the speaker.... [where plaintiffs] seek access to a particular means of communication," the channel of communication rather than the physical site is the relevant forum). Even if the property of the Church itself is considered an open forum and the IRS could not constitutionally revoke the Section 501(c)(3) status of a church on the basis of statements made in the church, the IRS clearly may revoke the tax-exempt status of any organization that publishes an advertisement in opposition to a candidate for public office. *See Regan v. Taxation with Representation*, 461 U.S. 540, 546, 103 S.Ct. 1997, 76 L.Ed.2d 129.

Finally, plaintiffs contend that the IRS viewed the Church as "militant right" and

that revocation of its Section 501(c)(3) status therefore constituted viewpoint discrimination. *See* Pls' Motion for Summ. J. at 30. As discussed *supra* at 23 – 24, however, plaintiffs have provided absolutely no evidence that the IRS revoked the Section 501(c)(3) status of the Church on the basis of its political views. Plaintiffs therefore have failed to establish a First Amendment violation. An Order consistent with this Opinion shall be issued this same day.

SO ORDERED.